IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| MARKUS A. GREEN #1118715 | § | |
| | § | |
| V. | § | A-08-CA-036-LY |
| | § | |
| DAVID BOYD, PAULA BELVILLE, | § | |
| RHONDA CLIFTON, | § | |
| JULIE JACOBS LONG, | § | |
| CELIA CASTRO, WILLIAM GRAMPRE, | § | |
| AVIANCA WONG, PATSY BELL, | § | |
| NATHANIEL QUARTERMAN, | § | |
| DOUGLAS BEESON, and | § | |
| JAY FOGELMAN | § | |

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

To:     The Honorable Lee Yeakel, United States District Judge

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. §636(b) and Rule 1(f) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrates, as amended, effective December 1, 2002.

Before the Court is Plaintiff's complaint (Document 1). Plaintiff, proceeding pro se, has paid the full filing fee for his case.

## STATEMENT OF THE CASE

At the time he filed his complaint pursuant to 42 U.S.C. § 1983, Plaintiff was confined in the Neal Unit of the Texas Department of Criminal Justice - Correctional Institutions Division. Plaintiff

1

alleges he was arrested by Officer David Boyd on July 16, 2001, for four-year-old traffic tickets. Plaintiff asserts he was arraigned by Justice of the Peace Celia Castro.  At the time of his arrest, Plaintiff contends he was being investigated for the alleged sexual assaults of Avianca Wong, Lisa Vu and Delia Banda.  Plaintiff alleges Detective Clifton, Detective Long, Detective Belville and Justice of the Peace Castro conspired with Officer Boyd "to create sexual assault crimes out of thin air and get Plaintiff arrested on time-barred tickets and subsequently charge him with sexual assault crimes falsely."

According to Plaintiff, Castro knew she did not have probable cause to have Plaintiff arrested for the sexual assaults, and she backdated arrest and search warrants.  Plaintiff also alleges Castro set his bail extremely high to keep Plaintiff in custody.

Plaintiff maintains Boyd, Belville, Castro, Clifton, and Long violated Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights and violated 18 U.S.C. §§ 241 and 242.  With respect to Detective Clifton, Plaintiff alleges Clifton falsely stated in her affidavit that she had spoken with Dr. Lisa Savage in connection with the alleged sexual assaults, knowing this was false.  Plaintiff also alleges Clifton, Belville, Long and Boyd allowed members of the media to be present during his arrest and search of his office in order to inflame the minds of potential jurors.  Plaintiff further alleges Detective Clifton committed perjury at trial when she testified that she was the entry officer and burst the door down to gain entry into Plaintiff's office.  Plaintiff explains she did not enter his office using that method.  Plaintiff alleges Detective Belville lied under oath when she stated in a sworn affidavit that victim Banda told her she had been sexually assaulted by Plaintiff or that Plaintiff had performed a procedure without Banda's consent.  Similarly, Plaintiff alleges Detective Long lied under oath when she stated in a sworn affidavit of arrest that victim Vu told her she had been

sexually assaulted by Plaintiff or that his actions had occurred without her consent. Plaintiff further alleges Detectives Clifton, Belville and Long committed perjury to the grand jury when they either directly or indirectly allowed the grand jury to believe each of the alleged victims were sexually assaulted and that they were restrained and rendered unconscious.

Plaintiff alleges victim Wong and her boyfriend Grampre committed perjury under oath when they allowed grand jury members to believe she was a victim of sexual assault committed by Plaintiff and the crime occurred while she was restrained and rendered unconscious. Plaintiff alleges Officer Boyd committed perjury before Plaintiff's trial when he stated an arrest warrant regarding sexual assault had already been issued prior to Plaintiff's arrest and he decided to arrest Plaintiff for traffic tickets instead. Plaintiff further alleges Detective Clifton photographed an item of female clothing during the alleged illegal office search and then falsely testified that the item was a pair of female panties.

According to Plaintiff, he hired Attorney Douglas Beeson to represent Plaintiff on the charges against him in 2001. Plaintiff complains Beeson refused to investigate Plaintiff's claims that detectives had set him up and fabricated false arrest charges against him. Plaintiff further complains Beeson refused to use his private investigator to investigate Plaintiff's claims of perjured statements and illegal search and seizure. Plaintiff asserts Beeson talked Plaintiff into being examined by psychiatrist Dr. Jay Fogelman. Plaintiff asserts Fogelman conducted a mini mental evaluation in April 2002. After being examined, Plaintiff learned Fogelman had lost his license and was prevented from seeing new patients. Plaintiff argues Beeson knew that Fogelman was not licensed, and he refused to report the fraud. Plaintiff complains Beeson and Fogelman conspired with each other to charge Plaintiff for an unlicensed mental exam in order to convince him to plead guilty.

3

With respect to Warden Patsy Bell, Plaintiff alleges she used the charges for sexual assault to order DNA collection from Plaintiff on February 1, 2007.  He further alleges Warden Bell recommended that Plaintiff be required to register and attend sex offender treatment when released on parole.  Plaintiff claims he has notified Nathaniel Quarterman of the unlawful collection of DNA.

Plaintiff sues Officer David Boyd, Detective Paula Belville, Detective Rhonda Clifton, Detective Julie Jacobs Long, Justice of the Peace Celia Castro, William Grampre, Avianca Wong, Warden Patsy Bell, Director Nathaniel Quarterman, Attorney Douglas Beeson, and Dr. Jay Fogelman.  Plaintiff requests the Court to order an investigation by the United States Department of Justice, to order Defendants Quarterman and Bell to produce the DNA material and all negative entries in Plaintiff's file connected to the false arrest charges, and to issue subpoenas to the grand jury to determine which witnesses misled them to believe the victims were sexually assaulted, restrained and unconscious.  He further requests from each defendant compensatory damages in the amount of $3,000,000 and punitive damages in the amount of $2,000,000.  Finally, he requests attorney fees and court costs.

The factual background of Plaintiff's criminal case is found in the Court of Appeals opinion, affirming his conviction, and is repeated below.

> The complaining witness in this case is A.W., a nineteen-year-old woman.  A.W. testified that on July 9, 2001, a man named "Darrell" called her and told her that she had a sexually transmitted disease (STD) and that she needed to come to a health clinic to be tested. FN3  She was told by the person on the phone that she could die from an STD if she were not immediately treated.  A.W. made an appointment with "Darrell," and she and her then-boyfriend, W.G., went to the "Austin Complement Health Clinic" (the "clinic") FN4 in the Shoal Creek Medical Building, a professional medical office building.  The clinic contained a waiting room with a table and magazines, chairs upholstered in what appeared to be black leather, end tables, lamps, and a flowering plant.  A framed, poster-sized, dental-health advisory

advertisement hung on one of the walls, and the floor was carpeted in a plain gray color.

FN3. A.W. could not remember whether "Darrell" told her the name of the clinic over the telephone.  However, she testified that he gave her an address and that the clinic she went to was the same as the clinic to which "Darrell" told her to go. W.G., A.W.'s former boyfriend, identified this person as "Dwayne."

FN4. The name of the clinic was labeled on a plaque outside of the clinic door.

After A.W. and W.G.'s arrival, appellant appeared wearing a white lab coat and introduced himself to both A.W. and W.G. as "Dr. Markus Green." FN5  A.W. had never seen appellant before and had no idea how he obtained her contact information.

FN5. She acknowledged that appellant never showed her anything specifically identifying appellant as an "M.D."

Appellant assisted A.W. to complete a standard medical-history form and informed her that she had syphilis.  He did not discuss with her how she had contracted the disease or on what basis he formed his conclusion.  He then led A.W. to an examination room,FN6 which contained tall white cabinets, a small sink and counter with several different types of surgical supplies on top of the counter, several curtained areas, a rolling doctor's stool, a tall lamp, and an examination table.  The table was equipped with stirrups, medical wax paper, and utility drawers.  On the wall, a sign identified appellant as "Doctor Markus Green."  Appellant asked A.W. to disrobe and provided her with a cotton robe.  Because she had never been given a full gynecological examination, A.W. did not know what to expect.

FN6. W.G. remained in the waiting room.

Appellant then measured A.W.'s blood pressure.  Once A.W. was on the table, appellant pulled open her robe. He used the wooden end of a cotton swab to poke at A.W.'s nipples, examining them for "excess discharge." He did not check her breasts for lumps.  Next, he inserted a plastic speculum into her vagina and widened it, to the point of causing her pain.  Appellant told A.W. that she had a mild yeast infection that needed to be broken up.  He inserted a vibrator into her vagina and operated it for about three minutes.  He then told her that everything else was okay.  He did not conduct any tests on A.W., nor did he prepare vaginal slides or ask for a urine sample.  He gave her Monistat 7 to treat her "infection."  After the examination, A.W. felt awkward and vomited in the bathroom.

After her visit to appellant's clinic, A.W. contacted the Austin Police Department, where she received counseling from a crime victim's counselor.  As a result of her

encounter with appellant, she said she regularly experienced periods of shortness of breath, headaches, and tingling and numbness in her fingers and body. She also testified that after her experience, she has felt less trusting of people and has had trouble communicating her feelings to others.

W.G. also testified.FN7 He repeated the details of the circumstances that led up to A.W.'s appointment with appellant. Appellant would not allow him in the examination room with A.W. From the waiting room, he heard a humming noise, and a few minutes later he heard A.W. vomit. He then went to the examination room and found her "balled up" on the floor and crying. Appellant then spoke with W.G. about STDs and asked him for a urine sample. Appellant tested W.G.'s urine with a test strip and told him that he tested negative for any kind of STD. He then gave W.G. vitamin B6 and other "antibacterial pills." FN8  W.G. then went into the bathroom, where A.W. was again vomiting. Appellant also entered the bathroom, and in order to reassure A.W. and W.G. that the clinic was really a doctor's office he illuminated the room with a blacklight to demonstrate that there was bacteria and blood on the walls.

FN7. W.G. and A.W. ended their romantic relationship at some point after these events.

FN8. W.G. could not remember what these other "antibacterial pills" were. He consumed those pills while at the clinic, and he testified that he "blacked out" briefly on his way home after the appointment.

Before A.W. and W.G. left the clinic, appellant told them a cost for the office visit and exam and quoted an additional $45 for the Monistat 7. Because they did not have money with them, appellant said he would mail them a bill. Finally, W.G. testified that following these events A.W. has had emotional problems: "She would start hyperventilating and crying real bad and she'd turn a bright, bright red, and she would just cry for [a] half hour to an hour at a time. Just hyperventilating and crying."

The jury also heard the testimony of A.W.'s mother, R.W. After the incident, A.W. described her experience to her mother. R.W. attempted on her own to determine whether appellant was a licensed physician. She called appellant's office to request an appointment for an STD exam. Later that evening, she received a phone call from appellant, who identified himself as "Dr. Markus Green." A.W.'s mother asked appellant about his qualifications, and appellant confirmed he was a doctor. He also told her that there were other doctors at the clinic.

Van Nguyen, who worked as an office temporary in the clinic, testified in court. She was placed by her agency at the clinic and worked for appellant for three days in July

2001.  When he contacted her for employment, he identified himself as "Dr. Green."
He wore a white lab coat and described himself as a "general doctor" who did
massages and treated patients with STDs.

An officer from the Texas Board of Medical Examiners testified that appellant was
not licensed to practice medicine in this state.  A medical-supply store clerk testified
that appellant, who identified himself as a doctor and dressed in a lab coat and
stethoscope, attempted to purchase medical supplies from the store.  A team of
officers from the Austin Police Department investigated this case.  They found
medical supplies, including a hand-held blacklight, a bag of disposable plastic
speculums, cotton-tip applicators, urinalysis strips, books on infectious diseases and
gynecology, a receipt book, checks in the name of "Dr. Markus Green,"and a box for
a "Flex-a-Pleasure" vibrator.  They also found a framed certificate from the
Massachusetts Medical Society.

Beth Nauert, a licensed physician who has conducted gynecological exams and
treated women for STDs, testified as an expert witness for the State. FN9  She
explained the proper procedure for conducting a gynecological exam.  Such an exam
includes taking a woman's vital signs, examining her breasts for lumps, and
examining the genital area for indications of cancer or other diseases.  A breast exam
consists of examining the entire breast for lumps.  Testing for syphilis requires a
blood test, and not a breast or a gynecological exam.  To make an immediate
diagnosis of syphilis, one would need at least fifteen minutes and have access to a
laboratory to spin blood drawn from the patient.  Furthermore, doctors test for a yeast
infection by examining a discharge under a microscope.  The physician testified that
she had never heard of using a vibrator to break up a discharge as a form of diagnosis
or treatment for a yeast infection or an STD, nor is it common practice to use a
vibrator during a gynecological exam.

FN9. She typically introduces herself as "doctor" and not as a licensed physician.

Appellant testified in his own defense.FN10  He was certified by Travis County to
do business as "Austin Complement Health Clinic."   However, he is not a
professional in any field in Texas in which he could call himself a doctor.  He
planned to make money by screening patients for STDs, referring them to a research
facility, and receiving commissions from the facilities for placing the individual.  He
emphasized that he was screening, rather than diagnosing, patients.  Appellant further
testified that he purchased medical supplies and a roll-around stool "that doctors sit
on," and set up an office.

FN10. Appellant also offered the testimony of several other witnesses.  However,
their testimony is not relevant to the issues presented on appeal.

He selected A.W. because he suspected she had "crabs." FN11  During a physical examination, appellant testified that he removed one "crab."  He admitted that he inserted the speculum into A.W.'s vagina.  He stated that she was "tense" and that he used the vibrator in her vagina as "vibration therapy" to relax her muscles.  He claimed to have taken a vaginal swab and to have looked at the swab under the microscope for "clue cells."  He also decided to conduct a "urinalysis" on W.G. and advised him to see a urologist.

FN11. By "crabs," appellant was apparently referring to crab lice, sucking lice of the classification Phthirus pubis that infest the human body in the pubic region. See Webster's Third New International Dictionary 527 (1986).  Again, appellant did not indicate on what information he based his conclusion.

Finally, the record contains almost eighty exhibits, including photographs of the clinic and of equipment used by appellant, notes made about clients of the clinic, lists made by appellant of supplies to buy, and certificates and mail addressed to "Doctor Marcus Green" or "Dr. Marcus Green," among other items.

Green v. State, 137 S.W.3d 356, 359-62 (Tex. App.– Austin 2004, pet. ref'd).

DISCUSSION AND ANALYSIS

A.      Standard Under 28 U.S.C. § 1915A

Although Plaintiff paid the full filing fee for this case, his claims must be screened pursuant to 28 U.S.C. § 1915A.  On review, the Court must dismiss the complaint, or any portion of the complaint, if the complaint is frivolous, malicious, or fails to state a claim upon which relief may be granted or seeks monetary relief from a defendant who is immune from such relief.  See Martin v. Scott, 156 F.3d 578 (5th Cir. 1998).

When reviewing a plaintiff's complaint, the court must construe plaintiff's allegations as liberally as possible. Haines v. Kerner, 404 U.S. 519, 92 S. Ct. 594 (1972).  However, the petitioner's pro se status does not offer him "an impenetrable shield, for one acting pro se has no license to harass others, clog the judicial machinery with meritless litigation and abuse already overloaded court dockets."  Farguson v. MBank Houston, N.A., 808 F.2d 358, 359 (5th Cir. 1986).

8

B.    Judicial Immunity

Insofar as Plaintiff is seeking monetary damages against Defendant Castro, this individual is entitled to absolute immunity for any acts performed as a judge.  It is well settled law that a judge enjoys absolute immunity from liability for damages for judicial acts performed within his jurisdiction.  Hale v. Harney, 786 F.2d 688, 690 (5th Cir. 1986).  The doctrine of absolute judicial immunity protects judges not only from liability, but also from suit.  Mireless v. Waco, 502 U.S. 9, 11, 112 S. Ct. 286, 288 (1991).  Motive of the judicial officer is irrelevant when considering absolute immunity.  See, Mitchell v. McBryde, 944 F.2d 229, 230 (5th Cir. 1991) ("The judge is absolutely immune for all judicial acts not performed in clear absence of all jurisdiction, however erroneous the act and however evil the motive.").

Absolute judicial immunity is overcome in only two rather narrow sets of circumstances: first, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity, and second, a judge is not immune for actions, though judicial in nature, taken in complete absence of all jurisdiction.  Mireless, 502 U.S. at 11-12, 112 S. Ct. at 288. "A judge's acts are judicial in nature if they are 'normally performed by a judge' and the parties affected 'dealt with the judge in his judicial capacity.'"  Boyd v. Biggers, 31 F.3d 279, 285 (5th Cir. 1994) quoting, Mireless, 502 U.S. at 12, 112 S. Ct. at 288.  In the case at bar, Plaintiff does not complain of any actions taken by Castro that were nonjudicial in nature nor does he show that she was acting in the clear absence of all jurisdiction.

C.    No Constitutional Violation

Assuming the facts alleged in the complaint are true, Plaintiff failed to assert a cognizable § 1983 claim against Defendants Boyd, Belville, Clifton and Long.  Read liberally, Plaintiff alleges

9

Officer Boyd arrested him on a warrant regarding traffic tickets, allowed the media to be present during his arrest and lied that there was also a warrant for Plaintiff's arrest regarding the alleged sexual assaults.  Plaintiff's conclusory allegations are insufficient to allege a valid constitutional violation.

Plaintiff alleges Detective Clifton lied in her affidavit about talking to Dr. Savage about the alleged sexual assaults, lied at trial regarding the method she used to enter Plaintiff's office, and took a photograph at Plaintiff's office of "phantom evidence," identified as ladies panties.  None of these allegations are sufficient to state a valid claim.  Similarly, Plaintiff alleges Detectives Belville and Long lied under oath that two of the victims claimed they were sexually assaulted.  Yet, Plaintiff admits he was arrested by Officer Boyd for traffic tickets and later convicted of practicing medicine without a law license as a result of conducting a physical examination as described above.  Although the Court is uncertain as to the exact claims Plaintiff is making against Defendants Boyd, Belville, Clifton and Long, the Court is absolutely certain Plaintiff has failed to state a valid constitutional violation.

> D.    <u>State Actors</u>

The provisions of 42 U.S.C. § 1983 state that every person who acts under color of state law to deprive another of constitutional rights shall be liable to the injured party.  A civil rights plaintiff must show an abuse of government power that rises to a constitutional level in order to state a cognizable claim.  <u>Love v. King</u>, 784 F.2d 708, 712 (5th Cir. 1986);  <u>Williams v. Kelley</u>, 624 F.2d 695, 697 (5th Cir. 1980), <u>cert. denied</u>, 451 U.S. 1019, 101 S. Ct. 3009 (1981).  Section 1983 suits may be instituted to sue a state employee, or state entity, using or abusing power that is possessed by virtue of state law to violate a person's constitutional rights.  <u>See</u>, <u>Monroe v. Pape</u>, 365 U.S. 167,

184, 81 S. Ct. 473 (1961); accord, Brown v. Miller, 631 F.2d 408, 410-11 (5th Cir. 1980).  A private

person may be amenable to suit only when the person is a willful participant in joint action with the

State or its agents.  Dennis v. Sparks, 449 U.S. 24, 27, 101 S. Ct 183, 186 (1980).

       An action which is essentially a tort claim for malpractice against appointed counsel cannot

be brought under §1983.  See O'Brien v. Colbath, 465 F.2d 358, 359 (5th Cir. 1972); Shapley v.

Green, 465 F.2d 874 (5th Cir. 1972).  Likewise, no claim under § 1983 can be brought against

retained counsel because retained counsel does not act under color of state law.  Pete v. Metcalfe,

8 F.3d 214, 217 (5th Cir. 1993); Russell v. Millsap, 781 F.2d 381, 383 (5th Cir. 1985), cert. denied,

479 U.S. 826, 107 S. Ct. 103 (1986).

       Attorney Douglas Beeson, Dr. Jay Fogelman, William Grampre, and Avianca Wong are not

state actors.  As such, Plaintiff has failed to state a valid claim against these defendants

       E.     DNA

       Plaintiff challenges the collection of his DNA sample by prison officials for registration in

a DNA database pursuant to Tex. Govt. Code § 411.148.  That section provides that prison officials

may take a DNA sample from an individual confined in a penal institution operated by or under

contract with the Texas Department of Criminal Justice.  That department is directed to collect the

sample from the individual during the diagnostic process or at another time determined by the Texas

Department of Criminal Justice.  The Fifth Circuit has held the Texas DNA collection program is

constitutional.  Velasquez v. Woods, 329 F.3d 420 (5th Cir. 2003) (per curiam).  In fact, every circuit

court to consider whether the collection of DNA samples from felons pursuant to similar statutes has

held the statute does not violate the Fourth Amendment.  See Shaffer v. Saffle, 148 F.3d 1180, 1181

(10th Cir. 1998) ("while obtaining DNA samples implicates Fourth Amendment concerns, it is

reasonable in light of an inmate's diminished privacy rights, the minimal intrusion involved, and the legitimate government interest in using DNA to investigate and prosecute crimes"); Rise v. Oregon, 59 F.3d 1556, 1559-62 (9th Cir. 1995) (same); Jones v. Murray, 962 F.2d 302, 306-08 (4th Cir. 1992) (same); see also Roe v. Marcotte, 193 F.3d 72, 78-82 (2d Cir. 1999) (compelled DNA testing valid under "special needs" exception to warrant requirement).  Accordingly, Plaintiff has failed to state a valid constitutional violation.

       F.       Sex Offender Counseling and Registration

Plaintiff complains Warden Bell has recommended that Plaintiff be required to register and attend the sex offender treatment program as part of his release and condition of parole.  Plaintiff is currently confined in the Neal Unit of the Texas Department of Criminal Justice - Correctional Institutions Division.  As he has not been released on parole, his claim is premature and simply conjecture.

       G.       Claims under 42 U.S.C. § 1985(3)

Plaintiff alleges the defendants conspired to violate Plaintiff's constitutional rights under 42 U.S.C. § 1985(3).  Title 42 U.S.C. § 1985(3) establishes a private right of recovery from persons who conspire to deprive an individual of equal protection of the laws.  Section 1985(3) was originally enacted by Congress as a part of the Ku Klux Klan Act in order to enforce the Civil War amendments to the Constitution and to provide a means of redress for persons victimized by the Klan's acts of terror and intimidation.  Scott v. Moore, 640 F.2d 708, 715 (5th Cir. 1981).  The statute imposes civil liability on persons conspiring to deprive another person or class of persons of "the

equal protection of the laws, or of equal privileges and immunities under the laws."[1]  In 1971, the Supreme Court ruled that to "accord to the words of the statute their apparent meaning" and § 1985(3) must be read to provide a civil remedy for damages against wholly private infringements of constitutionally protected rights, i.e. it protected persons from "private conspiracies."  Griffin v. Breckenridge, 403 U.S. 88, 101, 97, 91 S. Ct. 1790, 1795, 1798 (1971).  Thus, § 1985(3) applies to the situation presented:  a racially-motivated conspiracy to deny equal protection of the laws.  See United Brotherhood of Carpenters and Joiners v. Scott, 463 U.S. 825, 834, 103 S. Ct. 3352, 3359 (1983).

It is well-settled law that the discriminatory animus behind an alleged violation of section 1985(3) must be racially based or in some other way class-based.  Galloway v. Louisiana, 817 F.2d 1154, 1159 (5th Cir. 1987) (citing Griffin v. Breckenridge, 403 U.S. at 102, 91 S. Ct. at 1798 (1971)).  Also, in order to have § 1985(3) protection, a plaintiff must show membership in some group with inherited or immutable characteristics (e.g., race, gender, religion, or national origin), or that the discrimination resulted from the plaintiff's political beliefs or associations.  Kimble v. D.J. McDuffy, Inc., 623 F.2d 1060, 1066 (5th Cir.1980).

In order to establish a conspiracy under § 1985(3), the plaintiff must prove that the co-conspirators agreed, either expressly or tacitly, to commit acts which will deprive the plaintiff of

---

[1]  The relevant part of section 1985(3) reads as follows:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class or persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

equal protection of the law.  <u>Mitchell v. United Parcel Service</u>, 21 F. Supp. 627, 630 (S.D. Miss. 1998); <u>Garrison v. City of Texarkana, Texas</u>, 910 F. Supp. 1196, 1207 (E.D. Tex. 1995) ("To prove the existence of a conspiracy under this statute, the plaintiff must allege and establish facts showing a meeting of the minds.").  Plaintiff's conclusory allegations of "conspiracy" with no supporting evidence are insufficient to raise a genuine issue for trial.  <u>Jacquez v. Procunier</u>, 801 F.2d at 793; <u>Fontenot v. Upjohn Co.</u>, 780 F.2d 1190, 1195-96 (5th Cir.1986);  <u>Copsey v. Swearingen</u>, 762 F. Supp. 1250, 1260 (M.D. La. 1991). Moreover, Plaintiff has not alleged any discriminatory animus behind any of the alleged actions of the defendants.

      H.     <u>Claims Under 18 U.S.C. §§ 241 and 242</u>

      Plaintiff appears to be trying to raise a claim under 18 U.S.C. § 241 and 242.  However, these are federal criminal statutes and do not create a civil cause of action.

<u>RECOMMENDATION</u>

      It is therefore recommended that Plaintiff's complaint be dismissed without prejudice for failure to state a claim pursuant to 28 U.S.C. § 1915A.  Any pending motions should be dismissed as moot.

      It is further recommended that Plaintiff should be warned that if Plaintiff files more than three actions or appeals while he is a prisoner which are dismissed as frivolous or malicious or for failure to state a claim on which relief may be granted, then he will be prohibited from bringing any other actions in forma pauperis unless he is in imminent danger of serious physical injury.  <u>See</u> 28 U.S.C. § 1915(g).

14

OBJECTIONS

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636 (b)(1)(C). Failure to file written objections to the proposed findings and recommendations contained within this report within ten days after service shall bar an aggrieved party from de novo review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. Douglass v. United Servs. Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc); Thomas v. Arn, 474 U.S. 140, 148 (1985); Rodriguez v. Bowen, 857 F.2d 275, 276-277 (5th Cir. 1988).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 16th day of May, 2008.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE

15